**CAPITAL CASE**
**Execution Scheduled: September 24, 2020**

# No. 20-70019

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

v.

**CHRISTOPHER ANDRÉ VIALVA**,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

—————————————

**APPELLEE'S BRIEF FOR THE UNITED STATES OF AMERICA**

—————————————

ROBERT A. PARKER
Criminal Division, Appellate Section
U.S. Department of Justice

JOHN F. BASH
United States Attorney

JOSEPH H. GAY, JR.
Appellate Chief

ELIZABETH BERENGUER
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
(210) 384-7100

ATTORNEYS FOR APPELLEE

## RECOMMENDATION ON ORAL ARGUMENT

The defendant is a federal prisoner who is due to be executed on September 24, 2020. He has filed this emergency appeal from the district court's order denying his motion to enjoin the execution. In the government's view, the district court acted within the scope of its discretion in determining that the defendant is not entitled to injunctive relief. The government therefore does not request oral argument insofar as it would delay this Court's resolution of the appeal. The government stands ready to present oral argument at the earliest opportunity, however, if argument would assist the Court's expeditious resolution of the case.

# TABLE OF CONTENTS

Pages

STATEMENT CONCERNING ORAL ARGUMENT ...............................ii

TABLE OF AUTHORITIES...............................................................iv

STATEMENT OF JURISDICTION.....................................................1

STATEMENT OF ISSUES..................................................................2

STATEMENT OF THE CASE ............................................................3

    I.   The Murders of Todd and Stacie Bagley .....................................3

    II.  Trial and Direct Appeal ............................................................5

    III. Postconviction Proceedings......................................................6

    IV. Motion to Enjoin Execution......................................................7

    V.  Rulings Under Review ..............................................................10

SUMMARY OF ARGUMENT ............................................................11

ARGUMENT .....................................................................................14

    THE DISTRICT COURT CORRECTLY DENIED
    VIALVA'S MOTION TO ENJOIN HIS EXECUTION ...................14

    I. Legal Framework .......................................................................14

    II. Once a Federal Court Sentences a Defendant to Death, the
        Government Does Not Need Further Judicial Authorization
        to Set an Execution Date or Carry Out the Sentence ................16

        A. The Executive Branch Has Lawful Authority to Set the
           Date of Vialva's Execution and to Carry it Out...................17

        B. The District Court Issued the Order Vialva Requested........25

    III. The FDPA Does Not Require the Government to Comply
         With a State's Pre-Execution Procedures...............................26

A. Section 3596(a)'s Reference to the "Manner" of Implementing a Death Sentence Refers Only to the Choice of Execution Method ................................................. 27

B. Even If the "Manner" of Implementing a Death Sentence Includes Some Procedural Details Related to Effectuating Death, It Would Not Require the Government to Comply With a State's Pre-Execution Requirements ..................................................................... 32

IV. Equitable Considerations Do Not Favor Injunctive Relief ........ 36

CONCLUSION .................................................................................. 40

CERTIFICATE OF SERVICE ............................................................ 41

CERTIFICATE OF COMPLIANCE ..................................................... 42

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Adams v. Thaler,*
679 F.3d 312 (5th Cir. 2012) ........................................................14

*Anderson v. Jackson,*
556 F.3d 351 (5th Cir. 2009) ........................................................16

*Andres* v. *United States,*
333 U.S. 740 (1948) ..............................................................30, 32

*Barr v. Lee,*
No. 20A8, 2020 WL 3964985 (U.S. Jul. 14, 2020)..........................14, 37

*Barr v. Roane,*
140 S. Ct. 353 (2019) ........................................................28, 33, 34

*Bourgeois v. Barr,*
No. 19-1348, 2020 WL 3492763 (U.S. Jun. 29, 2020) ........................36

*Bucklew v. Precythe,*
139 S. Ct. 1112 (2019) .....................................................15, 19, 39

*Calderon v. Thompson,*
523 U.S. 538 (1998) ....................................................................39

*Crocker v. Navient Sols., L.L.C.,*
941 F.3d 206 (5th Cir. 2019) ........................................................29

*Crutsinger v. Davis,*
30 F.3d 705 (5th Cir. 2019) ..........................................................14

*Hall v. Hall,*
8 S. Ct. 1118 (2018) ....................................................................29

*Herrera v. Collins,*
506 U.S. 390 (1993) ....................................................................39

*Hill v. McDonough,*
547 U.S. 573 (2006) ...............................................................15, 37

*Holden v. Minnesota,*
  137 U.S. 483 (1890) ........................................................ 19, 24

*In re Fed. BOPs' Execution Protocol Cases,*
  955 F.3d 106 (D.C. Cir. 2020)...................................................... *passim*

*Jones v. Tex. Dep't of Crim. Just.,*
  880 F.3d 756 (5th Cir. 2018) ........................................................ 8, 14

*LeCroy v. United States,*
  No. 20-13353 (11th Cir. Sept. 16, 2020)................................. 17, 24, 34

*Murphy v. Collier,*
  919 F.3d 913 (5th Cir. 2019) ............................................................ 15

*Norwegian Nitrogen Prods. Co. v. United States,*
  288 U.S. 294 (1933) ........................................................................ 31

*O'Bryan v. Estelle,*
  691 F.2d 706 (5th Cir. 1982) .......................................................... 38

*Peterson v. Barr,*
  965 F.3d 549 (7th Cir. 2020), ..................................................... 18, 33

*Printz v. United States,*
  521 U.S. 898 (1997) ........................................................................ 23

*Sells v. Livingston,*
  50 F.3d 478 (5th Cir. 2014) ............................................................. 14

*Singh v. Duane Morris LLP,*
  538 F.3d 334 (5th Cir. 2008) .............................................................. 1

*Texas v. Real Parties in Interest,*
  259 F.3d 387 (5th Cir. 2001) ............................................................. 1

*Texas v. Ysleta Del Sur Pueblo,*
  955 F.3d 408 (5th Cir. 2020) ............................................................ 16

*United States v. Armstrong,*
  517 U.S. 456 (1996) ........................................................................ 19

*United States v. Bernard,*
  299 F.3d 467 (5th Cir. 2002) ................................................... 3, 4, 5, 6

*United States v. Bernard,*
  762 F.3d 467 (5th Cir. 2014) ................................................................ 6

*United States v. Mitchell,*
  No. 20-99009, 2020 WL 4815961 (9th Cir. Aug. 19, 2020) ............ 33, 37

*United States v. Tipton,*
  90 F.3d 861 (4th Cir. 1996) .................................................................. 19

*United States v. Vialva,*
  904 F.3d 356 (5th Cir. 2018) ................................................................. 7

*Vialva v. Watson et al.,*
  No. 20-2710 (7th Cir.) .......................................................................... 10

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................. 14

*Wood v. Collier,*
  836 F.3d 534 (5th Cir. 2016) .......................................................... 15, 32

**Federal Statutes**

5 U.S.C. § 301 ......................................................................................... 20

18 U.S.C. § 542 ....................................................................................... 29

18 U.S.C. § 1111 ....................................................................................... 5

18 U.S.C. § 1117 ....................................................................................... 5

18 U.S.C. § 2119 ....................................................................................... 5

18 U.S.C. § 3231 ....................................................................................... 1

18 U.S.C. § 3591 ....................................................................................... 6

18 U.S.C. § 3595 ....................................................................................... 1

18 U.S.C. § 3596(a) ........................................................................... passim

18 U.S.C. § 3597(a) ................................................................................. 31

18 U.S.C. § 3621 ..................................................................................... 21

18 U.S.C. § 3742(a) ................................................................................... 1

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 1292(a)(1) ............................................................... 1

28 U.S.C. § 1651(a) .................................................................... 1

28 U.S.C. § 510 ......................................................................... 21

28 U.S.C. § 566(c) ..................................................................... 21

28 U.S.C. § 2255 ......................................................................... 6

**State Statutes**

Tex. Code Crim. Proc. Ann. art. 43.141 .................................. 26–27, 35

Tex. Code Crim. Proc. Ann. art. 43.15 ........................................ 27, 35

**Federal Regulations**

28 C.F.R. § 26.1 ..................................................................... 17, 18

28 C.F.R. § 26.3(a) ....................................................................... 18

28 C.F.R. § 26.3(a)(4) .................................................................. 32

*Implementation of Death Sentences in Federal Cases,*
   57 Fed. Reg. 56536-01 (Nov. 30, 1992) ..................................... 17

*Implementation of Death Sentences in Federal Cases,*
   58 Fed. Reg. 4898–01 (Jan. 19, 1993) ...................................... 24

**Federal Rules**

Fed. R. Civ. P. 60(b)(6) ............................................................... 6

**Other Authorities**

Pardoning Power, 7 Op. Att'y Gen. 561 (1855) ..................................... 24

An Act to Provide for the Manner of Inflicting the
   Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937) .... 29, 31

Russell R. Wheeler & Cynthia Harrison, *Creating the Federal Judicial
   System* (Fed. Jud. Ctr., 3d ed. 2005), https://www.fjc.gov/content/
   creating-federal-judicial-system-third-edition-0 ............................... 23

Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112 ........................................ 28

Death-Warrants, 1 Op. Att'y Gen. 228 (1818) ........................... 21, 22, 23

Fed. Bureau of Prisons, *Manual of Policies and Procedures
    for the Administration of the Federal Penal and Correctional
    Service* 7 (1942)................................................................................ 31

*The Development of the Federal Prison System,*
    43 Fed. Prob. 13 (1979) ................................................................... 23

*U.S. Arranging to Execute Five,*
    Associated Press, June 17, 1938 ...................................................... 30

U.S. Const. art. II, § 3 .......................................................................... 19

U.S. Const. art. VI, cl. 2 ................................................................ 23, 25

## STATEMENT OF JURISDICTION

Defendant Christopher André Vialva is due to be executed on September 24, 2020, for the murders of Todd and Stacie Bagley. On August 14, 2020, Vialva filed a motion in the U.S. District Court for the Western District of Texas seeking to preliminarily enjoin his execution pursuant to the All Writs Act, 28 U.S.C. § 1651(a). (ROA.3573–84.) On September 11, 2020, the district court entered an order denying Vialva's motion for a preliminary injunction. (ROA.3663–73.) Vialva filed a timely notice of appeal on September 14, 2020. (ROA.3678–79.) The district court's jurisdiction over Vialva's criminal case exists under 18 U.S.C. § 3231, and this Court has jurisdiction to review the denial of injunctive relief under 28 U.S.C. § 1291 or, alternatively, 28 U.S.C. § 1292(a)(1).[1]

---

[1] Vialva contends (Br. 2) that the district court also had jurisdiction under the All Writs Act and that this Court has jurisdiction under statutes providing for appellate review of death sentences (18 U.S.C. §§ 3595, 3742(a)).  Those contentions are incorrect. The All Writs Act "cannot serve as an independent basis of jurisdiction." *Texas v. Real Parties in Interest*, 259 F.3d 387, 392 (5th Cir. 2001) (emphasis omitted); *see Singh v. Duane Morris LLP*, 538 F.3d 334, 341 (5th Cir. 2008). And Vialva is not challenging his death sentence on appeal; instead, he is challenging the district court's refusal to grant preliminary injunctive relief to delay his execution based on the government's alleged failure to comply with certain procedures.

## STATEMENT OF THE ISSUES

1.     Whether federal law requires the government to obtain a judicial warrant authorizing it to carry out a lawfully imposed death sentence.

2.     Whether the Federal Death Penalty Act, 18 U.S.C. § 3596(a), requires the government to comply with all pre-execution procedures set forth in Texas state law before carrying out Vialva's death sentence.

3.     Whether Vialva has demonstrated that equitable factors favor injunctive relief.

## STATEMENT OF THE CASE

### I.    The Murders of Todd and Stacie Bagley

In 1999, Vialva, Brandon Bernard, and three other members of a street gang in Killeen, Texas, carjacked and murdered Todd and Stacie Bagley. *See United States v. Bernard*, 299 F.3d 467, 471–73 (5th Cir. 2002). Vialva and his fellow gang members initially developed a plan to abduct and rob a motorist at gunpoint, lock the victim in the trunk of his car, use the victim's bank card to make ATM withdrawals, and then abandon the vehicle (with the victim still locked in the trunk) in a remote area. *Id.* at 471.

Vialva and his accomplices drove around town searching for a suitable victim, and eventually chose the Bagleys, youth ministers who were visiting Killeen from Iowa. 299 F.3d at 471–72. While Todd used a pay phone and his wife, Stacie, waited in their car, the group approached Todd and asked for a ride. *Id.* at 472. Todd agreed, and Vialva and two of his accomplices got into the back seat of the Bagleys' car. *Id.* After giving Todd directions, Vialva pulled a handgun on Todd and stated that "the plans have changed." *Id.* The trio then robbed the Bagleys, forced the Bagleys into the trunk of their car, and drove around in the car for several

3

hours attempting to empty the Bagleys' bank accounts from multiple ATMs and pawn Stacie's wedding ring. *Id.*

While locked in the trunk, the Bagleys spoke to Vialva's accomplices through the car's rear panel, discussing their faith and explaining that God's blessings were available to anyone. 299 F.3d at 472. Later, after one accomplice told Vialva that he no longer wanted to go through with the crime, Vialva "insisted on killing the Bagleys and burning their car to eliminate the witnesses" and any incriminating fingerprints. *Id.* Vialva drove to his home, where he retrieved a ski mask and clothing. *Id.* Meanwhile, the Bagleys pleaded with Vialva's accomplices for their lives. *Id.*

When Bernard and another gang member rejoined the group, "Vialva repeated that he had to kill the Bagleys because they had seen his face." 299 F.3d at 472. Bernard purchased lighter fluid, *id.*, and Vialva, Bernard, and two other gang members then drove the Bagleys' car (with the Bagleys still in the trunk) and Bernard's car to a remote location on the Fort Hood military installation. *Id.* at 472–73. Bernard helped pour lighter fluid in the Bagleys' car, while the Bagleys sang and prayed in the trunk. *Id.* at 472. Stacie said, "Jesus loves you" and "Jesus,

4

take care of us." *Id.* Vialva replied, "Shut the fuck up, bitch, I'm about to open the trunk and I don't want to hear that shit." (ROA.5729.) He then put on his mask, ordered the trunk opened, and shot the Bagleys. 299 F.3d at 472–73. Vialva shot Todd in the head at close range, killing him instantly. But his shot to the side of Stacie's face merely knocked her unconscious. *Id.* Bernard then set fire to the car, killing Stacie, who died of smoke inhalation. *Id.* at 473.

## II.    Trial and Direct Appeal

Following a jury trial in the U.S. District Court for the Western District of Texas, Vialva was convicted on four counts: carjacking resulting in death, in violation of 18 U.S.C. § 2119; conspiracy to commit murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1111 and 1117; and two counts of murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111. *See* 299 F.3d at 474. Following a capital sentencing hearing, the jury unanimously recommended that Vialva be sentenced to death on the carjacking and murder counts. *Id.* The district court imposed that sentence pursuant to

the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591 *et seq. See* 299 F.3d at 474.

This Court affirmed the district court's judgment on direct appeal. 299 F.3d at 489. The Court subsequently denied rehearing *en banc* and issued its mandate on October 23, 2002. (*See* ROA.906.) The Supreme Court denied certiorari. 539 U.S. 928 (2003).

### III.   Postconviction Proceedings

In 2004, Vialva filed a motion to vacate his death sentence under 28 U.S.C. § 2255. (ROA.974–1187.) The district court denied Vialva's § 2255 motion and denied his request for a certificate of appealability (COA). (ROA.2644–2706.) This Court likewise denied a COA, *United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014), and the Supreme Court denied certiorari, 136 S. Ct. 1155 (2016).

In 2017, Vialva filed a motion under Federal Rule of Civil Procedure 60(b)(6), seeking relief from the district court's judgment denying his § 2255 motion. (ROA.2843–63.) The district court dismissed Vialva's Rule 60(b)(6) motion for lack of jurisdiction as an uncertified successive § 2255 motion, and denied a COA. (ROA.3534–39.) This Court likewise denied a

COA, *United States v. Vialva*, 904 F.3d 356 (5th Cir. 2018), and the Supreme Court denied certiorari, 140 S. Ct. 860 (2020).

## IV.    Motion to Enjoin Execution

On July 31, 2020, the federal Bureau of Prisons (BOP)—at the direction of the Attorney General—scheduled Vialva's execution for September 24, 2020. (ROA.3564; *see* ROA.3585–86 (letter officially notifying Vialva and his counsel of the execution date).) On August 14, 2020, Vialva filed a motion in the district court pursuant to the All Writs Act, 28 U.S.C. § 1651(a), seeking to enjoin BOP and the U.S. Marshals Service (Marshals) from carrying out his execution. (ROA.3573–84.) The district court construed Vialva's motion as a request for a preliminary injunction and, following a hearing, denied the motion. (ROA.3663–73.)

The district court explained that, to obtain a preliminary injunction, Vialva had to show (1) "'a substantial likelihood of success on the merits'" of his claims; (2) "'a substantial threat of irreparable injury'"; (3) that the harms from denial of injunctive relief would outweigh the harms of granting such relief; and (4) that the public interest favored an injunction. (ROA.3666 (quoting *Jones v. Tex. Dep't of Crim. Just.*, 880

7

F.3d 756, 759 (5th Cir. 2018)).) The court determined that Vialva could not satisfy any of those requirements.

As relevant here, Vialva argued that his execution was unlawful because the government had not obtained a judicial warrant authorizing the Marshals to carry out his death sentence and had not complied with several pre-execution procedures set forth in Texas law related to setting the execution date, issuing a warrant, and notifying the defendant and his counsel. (ROA.3576–82.) The district court rejected those assertions as inconsistent with federal law. (ROA.3668–71.) The court explained that federal law and the court's judgment already authorized the Marshals to proceed with Vialva's execution and that no further warrant was necessary. (ROA.3668.) The court also issued a supplemental order "out of an abundance of caution" that ratified Vialva's existing execution date and directed the Marshals to carry out Vialva's sentence—even as it reiterated that such an order was not "required to empower" the government to proceed. (ROA.3674–75.)

As for Vialva's reliance on provisions of Texas law, the district court observed that every court of appeals to have considered the question had determined that the FDPA at most requires the federal government to

8

comply with a state's procedures for "effectuating death," such as the choice of execution method and lethal injection drug, and does not require compliance with the sort of "pre-execution procedures" Vialva had identified. (ROA.3670–71 (citing cases).) Accordingly, the court found no likelihood that Vialva could succeed on the merits of his claims.

The district court also determined that Vialva could not satisfy any of the equitable requirements for obtaining injunctive relief. (ROA.3671–73.) The court explained that Vialva was not challenging the death sentence itself and had not identified any "irreparable injury" or "cognizable harm" he would likely suffer if his sentence was carried out using BOP's procedures rather than Texas's procedures. (ROA.3671–72.) The court further determined that the public's strong interest in carrying out Vialva's sentence, especially after his rights to direct appeal and collateral review had been exhausted, outweighed Vialva's interest in further delay. (ROA.3672–73; *see* ROA.3673 ("Vialva committed the horrendous murders of Stacie and Todd Bagley over 21 years ago and has

received the full panoply of procedural protections afforded under the Constitution and the FDPA. No further delay is warranted.").[2]

## V.    Rulings Under Review

Vialva challenges (1) the district court's order denying his motion to enjoin his execution, ROA.3663–73; and (2) the district court's supplemental order, entered solely as a prophylactic measure, ratifying his execution date and directing the Marshals to carry out his death sentence, ROA.3674–75.

---

[2] Although not directly relevant to these proceedings, Vialva has also challenged his execution in two other jurisdictions. On August 10, 2020, Vialva filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 and a request for a stay of execution in the United States District Court for the Southern District of Indiana, where he is incarcerated. *See Vialva v. Warden, USP-Terre Haute*, No. 2:20-cv-413 (S.D. Ind.). The district court denied Vialva's habeas petition and stay request on September 8, 2020. Vialva has appealed that decision to the Seventh Circuit. *See Vialva v. Watson et al.*, No. 20-2710 (7th Cir.). Vialva has also filed a civil claim in the U.S. District Court for the District of Columbia challenging the federal government's lethal injection protocol. *See Vialva v. Barr et al.*, No. 1:20-cv-1693 (D.D.C.). That case has been consolidated with similar lawsuits filed by other federal inmates who have been sentenced to death. *See In re Fed. BOPs' Execution Protocol Cases*, No. 1:19-mc-145 (D.D.C.).

## SUMMARY OF ARGUMENT

Although barely mentioned in Vialva's opening brief, this case comes to the Court on review of the district court's denial of Vialva's motion for a preliminary injunction. To obtain that extraordinary relief, Vialva must show a substantial likelihood of success on the merits of his claims, irreparable injury, and that the balance of harms and the public interest favor injunctive relief. Vialva has not established a likelihood of success on the merits and does not address the remaining equitable factors in his brief. The district court's denial of a preliminary injunction should be affirmed.

1.    Once a federal court issues a judgment sentencing a defendant to death, the Executive Branch has lawful authority to set the execution date and carry out the sentence without further authorization from the court. Nothing in the Constitution, federal statutes and regulations, or court decisions supports Vialva's assertion that an additional "judicial warrant" is required or that the Executive Branch's authority is dependent on state law. Indeed, each of those sources—as well as consistent historical practice—establishes that the Executive Branch has independent authority to implement federal courts'

11

sentencing judgments. The fact that the Executive Branch and the Judiciary have traditionally shared responsibility for setting execution dates supports the conclusion that such responsibility has not been ceded to the courts.

In any event, the district court in this case issued a supplemental order ratifying Vialva's execution date and explicitly authorizing the Marshals to proceed. That order gave Vialva what he asked for, and he therefore cannot show a strong likelihood of success on his claim that his execution is unlawful due to the lack of such an order.

2.    The FDPA does not require the federal government to comply with Texas's pre-execution procedural requirements. The relevant provision of 18 U.S.C. § 3596(a)—requiring the government to implement a death sentence "in the manner prescribed by the law of the State in which the sentence is imposed"—refers to the state's top-line choice of execution method, such as lethal injection, electrocution, or hanging. That is how the "manner" of execution has always been defined in federal law. At most, the term "manner" may also include certain secondary details related to effectuating death, such as the type and dosage of lethal-injection drug. But as every court of appeals to have interpreted

the provision has held, § 3596(a) clearly does not encompass the sort of pre-execution procedures Vialva identifies. Indeed, strictly complying with those procedures in this case would be impossible. Accordingly, Vialva cannot establish a substantial likelihood of success on the merits.

3.    The district court also determined that a preliminary injunction was not warranted because Vialva could not establish any of the equitable factors necessary for such relief. Vialva does not address those factors in his brief and has not otherwise shown that the district court's assessment of them was an abuse of discretion. Vialva has not demonstrated that he will suffer any cognizable harm from being executed pursuant to BOP's procedures rather than Texas's procedures. And the harm to the government, the victims, and the public interest from further delay in carrying out Vialva's lawful sentence is significant. Vialva was convicted over two decades ago for the brutal murders of Todd and Stacie Bagley, and his death sentence has been consistently upheld on direct appeal and multiple rounds of collateral review. The execution of that sentence should now proceed.

13

## ARGUMENT

## THE DISTRICT COURT CORRECTLY DENIED
## VIALVA'S MOTION TO ENJOIN HIS EXECUTION

### I.     Legal Framework

Injunctive relief is "an extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In order to qualify for a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jones*, 880 F.3d at 759 (quotation marks omitted); *see, e.g.*, *Sells v. Livingston*, 750 F.3d 478, 480 (5th Cir. 2014) (per curiam) (same for motion to enjoin execution); *Adams v. Thaler*, 679 F.3d 312, 318 (5th Cir. 2012) (same for motion to stay execution). A defendant's inability to demonstrate a strong likelihood of success on the merits "is, effectively, dispositive" of a request to stay or enjoin an execution. *Crutsinger v. Davis*, 930 F.3d 705, 707 (5th Cir. 2019); *see, e.g.*, *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *1 (U.S. Jul. 14, 2020) (per curiam) (vacating district court order enjoining scheduled executions where

14

prisoners failed to "establish[] that they are likely to succeed on the merits" of their claims).

As for the remaining factors, a defendant who challenges the methods or procedures for carrying out a death sentence, but not the sentence itself, must show that use of existing methods or procedures rather than proffered alternatives will cause him irreparable injury; the mere existence of his death sentence is not enough. *See Hill v. McDonough*, 547 U.S. 573, 580–81 (2006); *Wood v. Collier*, 836 F.3d 534, 542 (5th Cir. 2016). And in assessing the public interest and the potential harms of enjoining an execution, a court must take into account "the State's strong interest in enforcing its criminal judgments without undue interference" from courts—particularly where a capital defendant has exhausted the usual avenues for review of his death sentence and brings a claim shortly before that sentence is due to be carried out. *Murphy v. Collier*, 919 F.3d 913, 915 (5th Cir. 2019) (per curiam) (quoting *Hill*, 547 U.S. at 584); *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1133–34 (2019) (explaining that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence" that has been upheld on direct appeal and collateral review, and "[c]ourts

15

should police carefully against attempts to use [further] challenges as tools to interpose unjustified delay") (quotation marks omitted).

A district court's decision to deny injunctive relief "is entitled to deference" on appeal, *Texas v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 413 (5th Cir. 2020) (quotation marks omitted), and this Court "will [not] reverse the denial" of such relief absent "extraordinary circumstances," *Anderson v. Jackson*, 556 F.3d 351, 355–56 (5th Cir. 2009) (quotation marks omitted). In determining whether a district court has abused its discretion in denying a preliminary injunction, the court's legal conclusions are reviewed *de novo* and its factual findings are reviewed for clear error. *Ysleta Del Sur Pueblo*, 955 F.3d at 413.

## II.    Once a Federal Court Sentences a Defendant to Death, the Government Does Not Need Further Judicial Authorization to Set an Execution Date or Carry Out the Sentence.

Vialva contends (Br. 8–12) that the federal government may not "implement a death sentence imposed by a federal court" unless the court first issues a warrant "empower[ing] a United States marshal to carry out (or supervise) an execution and to fix the date on which it is to occur." As the district court correctly determined, "nothing" in the Constitution, federal statutes and regulations, or judicial decisions supports that

16

argument. (ROA.3669.) In any event, the district court issued a supplemental order ratifying Vialva's execution date and authorizing the Marshals to carry out his death sentence—which is exactly what Vialva claims is required. (ROA.3674–75.) Vialva cannot, therefore, show a substantial likelihood of success on the merits of his claim.

### A. The Executive Branch Has Lawful Authority to Set the Date of Vialva's Execution and to Carry It Out.

1.      In 1993, the Attorney General promulgated regulations to govern federal death sentences. *See* 28 C.F.R. § 26.1 *et seq.*[3] Those regulations vest BOP "with broad authority and discretion to set execution dates." *LeCroy v. United States*, No. 20-13353, slip op. at 4 (11th Cir. Sept. 16, 2020). The regulations provide, in relevant part, that "[e]xcept to the extent a court orders otherwise, a sentence of death shall be executed . . . [o]n a date and at a time designated by the Director of the Federal Bureau of Prisons," "[a]t a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons,"

---

[3] The 1993 regulations were prompted by Congress's passage of the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848 (1989), which authorized the death penalty for certain offenses but did not create rules for implementing that sentence. *See Implementation of Death Sentences in Federal Cases*, 57 Fed. Reg. 56536-01, 56536 (Nov. 30, 1992).

"[b]y a United States Marshal designated by the Director of the United States Marshals Service," and "[b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." *Id.* § 26.3(a). Accordingly, BOP acted within its lawful authority when, at the direction of the Attorney General, it scheduled Vialva's execution to take place on September 24, 2020. *See Peterson v. Barr*, 965 F.3d 549, 553 (7th Cir. 2020) ("[I]f the BOP observes the minimal requirements in the regulations—as it did here—then it has the unconstrained discretion to choose a date for the execution."), *stay denied*, No. 20A6, 2020 WL 3964236 (U.S. Jul. 14, 2020).[4]

---

[4] Vialva asserts (Br. 4) that the regulations also "require the Government to obtain a court order setting the date of execution and directing it to occur," but that is incorrect. Vialva relies on 28 C.F.R. § 26.2(a), which directs prosecutors to furnish the court with a "proposed Judgment and Order" prior to sentencing that states (among other things) that the "sentence shall be executed by a United States Marshal . . . on a date and at a place designated by the Director of the Federal Bureau of Prisons." *Id.* As the district court explained, that provision "does not indicate that the issuance of a judicial warrant is a prerequisite" to carrying out an execution, nor does the court have to adopt the proposed language "in order to confer [on the government] the authority to implement a lawfully imposed death sentence." (ROA.3669.) And in any event, the district court issued a supplemental order "out of an abundance of caution" that tracked the language in the proposed Judgment and Order. (ROA.3674–75.)

The authority conferred on BOP by the 1993 regulations is consistent with the Executive Branch's constitutional and statutory powers. *Cf. United States v. Tipton*, 90 F.3d 861, 902–03 (4th Cir. 1996) (concluding that "absent directly preempting congressional action, the Attorney General had constitutional and statutory authority to provide by regulation the means for executing death sentences"). Since the First Congress "made a number of" federal offenses "punishable by death" in the Crimes Act of 1790, *Bucklew*, 139 S. Ct. at 1122, and continuing to the present day, Congress has not prescribed a rule for fixing the date of execution. The Supreme Court has determined that, in the absence of such a legislative rule, the Constitution permits either the executive or judiciary to set an execution date. *Holden v. Minnesota*, 137 U.S. 483, 495–96 (1890). Vesting that power in the executive is also consistent with the Executive Branch's constitutional obligation to "take care that the Laws be faithfully executed," U.S. Const. art. II, § 3, which affords the Attorney General "broad discretion to enforce the Nation's criminal laws," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quotation marks omitted).

19

Federal statutes reinforce the Executive Branch's authority to set execution dates and carry out death sentences imposed by federal courts. The FDPA, for example, provides that "[a] person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." 18 U.S.C. § 3596(a). The statute further provides that, "[w]hen [a death] sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." *Id.* The FDPA therefore recognizes the central role of the Executive Branch in carrying out executions.

Congress has further authorized the Attorney General to "prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business," 5 U.S.C. § 301; has vested all functions of the Department of Justice in the Attorney General, 28 U.S.C. § 509; and has authorized officers, employees, and agencies of the Department to perform those functions,

28 U.S.C. § 510. That includes the Marshals, whose obligation is to "obey, execute, and enforce all orders of the United States District Courts," 28 U.S.C. § 566(a), and to "execute all lawful writs, process, and orders issued under the authority of the United States," 28 U.S.C. § 566(c); and the Bureau of Prisons, which is charged with determining the place and manner of custody of prisoners, 18 U.S.C. § 3621. Those provisions, too, reinforce the Executive Branch's authority to enforce judgments of the federal courts and to carry out sentences the courts have imposed.

2.    Vialva's contrary argument relies almost exclusively on an 1818 opinion of the Attorney General, which addressed the question of whether President James Monroe could issue a warrant "fix[ing] the day for the execution" in a case involving "mail-robbers" tried in Maryland before Supreme Court Justice Gabriel Duvall, who was riding circuit. Death-Warrants, 1 Op. Att'y Gen. 228 (1818). The Attorney General observed that there was "no uniform rule to guide the conduct of the President in this respect," which "can be prescribed by Congress only." *Id.* The Attorney General further observed that, although federal courts had generally followed "the practice of the State courts in which they hold their sessions" in deciding whether to set an execution date by court

21

order, "there is no law—that is, no positive act of Congress—which gives to the courts of the United States the express power of fixing the day." *Id.* In the absence of any congressional action, the Attorney General determined that the President had inherent power to issue warrants setting the date of an execution "in all cases where they are made necessary by the practice of the State in which the sentence is passed." *Id.*

Vialva asserts (Br. 11) that this opinion reflects a "judicially developed rule" that "when Congress is silent, executions must be implemented in the manner prescribed by state law, including that state's warrant requirements." Setting aside whether any such rule exists under current federal law (which, as explained in Part III below, it does not), nothing in the Attorney General's opinion—which urged the President to set an execution date—indicates that the Executive Branch lacks the ability to set Vialva's execution date here. In concluding that the President could set an execution date in the mail-robbers case, the Attorney General did not suggest, by negative implication or otherwise, that state law could compel the Executive Branch to cede to the courts exclusive authority to set execution dates. The issue the Attorney

22

General confronted in that case was that, because Justice Duvall was declining to schedule executions in deference to state practice, the prisoners would not be executed at all unless the President set a date. *See* 1 Op. Att'y Gen. at 228 (noting that "the case has become one of great emergency" in light of the prisoners' repeated efforts to escape). Vialva's broader reading of the Attorney General's opinion—that the implementation of federal sentences is entirely dependent, in states that so choose, on courts' willingness to set prompt execution dates—cannot be squared with the Attorney General's insistence on "giv[ing] effect to our laws." *Id.*; *see* U.S. Const. art. VI, cl. 2 (Supremacy Clause).[5]

Indeed, consistent with the action urged by the Attorney General in his 1818 opinion, the Supreme Court later explained that the default constitutional rule for setting execution dates is one of *shared* authority

---

[5] Moreover, to the extent deference to certain state procedures may have been prudent in 1818, given the dependence of federal law enforcement on state facilities at the time, that does not suggest that compliance with all state procedures is required to carry out a federal execution today. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 909–10 (1997) (describing early federal reliance on state assistance in carrying out federal sentences); Gregory L. Hershberger, *The Development of the Federal Prison System*, 43 Fed. Prob. 13 (1979) (same); *see also* Russell R. Wheeler & Cynthia Harrison, *Creating the Federal Judicial System* 8 (Fed. Jud. Ctr., 3d ed. 2005), https://www.fjc.gov/content/creating-federal-judicial-system-third-edition-0 (explaining that practice of circuit-riding in the late-18th and early-19th centuries was intended in part to expose Justices to "the state laws they would interpret" and "to legal practices around the country").

between the executive and judiciary. *See Holden*, 137 U.S. at 495–96. And as a matter of historical practice, both the Executive Branch and the Judiciary have set execution dates in federal death penalty cases. Accordingly, in an 1855 opinion, the Attorney General explained that sometimes the President fixed the date of execution and sometimes the courts, without regard to the requirements of state law. Pardoning Power, 7 Op. Att'y Gen. 561, 562 (1855); *see Implementation of Death Sentences in Federal Cases*, 58 Fed. Reg. 4898–01, 4899–4900 (Jan. 19, 1993) (describing 19th-century practices). In 1830, President Andrew Jackson decided to "leave" it to the "discretion of the court" to fix the date of execution in all cases—again, regardless of state requirements—and it appears that this became the "established practice" for a period. 7 Op. Att'y Gen. at 562–63.

Current federal law shifts principal responsibility for setting execution dates back to the Executive Branch, while also recognizing the concurrent authority of the courts. *See LeCroy*, slip op. at 6–7 (explaining that regulations authorizing BOP to set execution dates "'[e]xcept to the extent a court orders otherwise'" "reflect an understanding that courts historically played some concurrent role in—had some shared

24

responsibility for—setting execution dates in the first instance"). Nothing in the Attorney General's 1818 opinion, let alone the Constitution, supports Vialva's implicit suggestion that a state could unilaterally decide to override federal law in that regard. *See* U.S. Const. art. VI, cl. 2.

**B.    The District Court Issued the Order Vialva Requested.**

In any event, as explained, the district court issued a supplemental order in which it provided the judicial authorization that Vialva had requested, including explicitly directing the Marshals to carry out the execution on September 24, 2020. (ROA.3674–75.) The court explained that its original judgment sentencing Vialva to death (ROA.869–71) already "authorized the Department of Justice (DOJ)—including the Attorney General the Federal Bureau of Prisons and the United States Marshals Service—to determine the time, place, and manner of Vialva's execution and to carry out that execution," and it reiterated that it did "not believe another order is required to empower DOJ with this authority." (ROA.3674.) Nevertheless, the court issued the supplemental order Vialva wanted "out of an abundance of caution" in order to insulate his death sentence from further challenges. (ROA.3674.)

Vialva contends that even this action was not enough because the amount of time between the date of the district court's order and his scheduled execution is less than the 91 days provided for in Texas law. *See* Br. 19–20 ("Under Texas law, the earliest date the court could have set for Mr. Vialva's execution was December 12, 2020."). That assertion is incorrect for the reasons explained in Part III, *infra.* For present purposes, however, the court's supplemental order resolves Vialva's general objection to the absence of a judicial warrant setting the execution date and authorizing the Marshals to carry out his death sentence. Vialva cannot, therefore, demonstrate a substantial likelihood of success on the merits of that claim.

## III.    The FDPA Does Not Require the Government to Comply with a State's Pre-Execution Procedures.

Vialva contends (Br. 14–19) that his execution violates the FDPA's requirement that the "implementation of [a death] sentence" be "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), because BOP's pre-execution procedures do not track Texas's pre-execution procedures. Specifically, Vialva focuses on Texas's requirements that a state court set the execution date at least 91 days in advance, Tex. Code Crim. Proc. Ann. art. 43.141(a),

26

(c); that, within ten days of issuing the order setting the execution date, the court also "issue a warrant under the seal of the court" that "command[s] the director [of the relevant prison] to proceed" with the execution, *id.* art. 43.15(a); and that copies of the warrant and the execution-date order be served on defense counsel, *id.* art. 43.141(b-1) & 43.15(b). As the district court correctly determined, Vialva has not shown a substantial likelihood of success of the merits of that claim.

## A. Section 3596(a)'s Reference to the "Manner" of Implementing a Death Sentence Refers Only to the Choice of Execution Method.

The FDPA's directive to implement a federal death sentence in the "manner prescribed by" state law, 18 U.S.C. § 3596(a), requires only that BOP follow the State's "top-line choice among execution methods, such as the choice to use lethal injection instead of hanging or electrocution," not additional procedural details of the kind Vialva invokes. *In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020) (per curiam) (describing opinion of Katsas, J.), *cert. denied*, No. 19-1348, 2020 WL 3492763 (U.S. Jun. 29, 2020). That interpretation of the FDPA is articulated persuasively by Judge Katsas in his concurring opinion in the D.C. Circuit's recent FDPA litigation, *see id.* at 114–21, and was strongly

27

suggested by the three Supreme Court Justices who addressed the issue in an earlier phase of that litigation, *see Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.).

The FDPA's reference to "implementation of" a federal death "sentence in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), traces its roots to the Crimes Act of 1790, which provided that "the manner of inflicting the punishment of death[] shall be by hanging the person convicted by the neck until dead," ch. 9, § 33, 1 Stat. 112, 119. Vialva does not dispute that the "manner" provision of that statute—which governed federal executions for nearly 150 years—prescribed only the *general method* of execution ("hanging"), not other procedures or details related to the execution process. *Id.* That understanding "followed the law of England," where Blackstone equated the "manner" of execution with the general method of causing an offender's death—*e.g.*, "hanging"—rather than "subsidiary details" of the process. *In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d at 115 (Katsas, J., concurring).

Congress retained the statutory term "manner" in 1937 when it replaced the longstanding directive that the "manner of inflicting the

punishment of death shall be by hanging," 18 U.S.C. § 542 (1934), with a provision that the "manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed," An Act to Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937). There is no indication that Congress broadened the scope of the term "manner" as it had been understood since 1790—*i.e.*, as referring only to the general method of execution—by *retaining* the term in the 1937 Act. To the contrary, "if a word is obviously transplanted from another legal source," it typically "brings the old soil with it." *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (citation omitted); *see Crocker v. Navient Sols., L.L.C.*, 941 F.3d 206, 216 (5th Cir. 2019) (same).

The context and history of the 1937 Act strongly reinforce that presumption. The law was "prompted by the fact that" many States had adopted "'more humane *methods* of execution, such as electrocution, or gas,'" and that it was "'desirable for the Federal Government likewise to change its law *in this respect*.'" *Andres* v. *United States*, 333 U.S. 740, 745 n.6 (1948) (emphases added; citation omitted). The Supreme Court has accordingly explained that the 1937 Act adopted "the local mode of

29

execution," understood as the general method of execution—*e.g.*, "death by hanging." *Id.* at 745 & n.6.

Indeed, when the federal government announced the first executions under the 1937 Act, it made clear that the inmates would "be executed by whatever *method* is prescribed by the law of the State," while the Department of Justice would provide "all U.S. Marshals instructions for carrying out executions" that would govern "[u]nless [a] court specifies otherwise." *U.S. Arranging to Execute Five*, Associated Press, June 17, 1938 (emphasis added);[6] *see id.* (citing federal instructions regarding execution time and number of witnesses). BOP confirmed that understanding in a 1942 manual, explaining that the 1937 Act's "manner" provision "refers to the *method* of imposing death, whether by hanging, electrocution, or otherwise, and *not to other procedures* incident to the execution prescribed by the State law." Fed. Bureau of Prisons, *Manual of Policies and Procedures for the Administration of the Federal Penal and Correctional Service* 7 (1942) (emphases added).[7] The manual

---

[6] A copy of the article is attached as an addendum to this brief.

[7] A copy of the relevant portion of the 1942 manual is attached as an addendum to this brief.

included regulations providing that a U.S. Marshal would be in "charge of the conduct of executions," which would occur "at the place fixed in the judgment" of the court or "designated by the Department of Justice." *Id.* at 7–8. The manual also specified details about the execution date, time, and witnesses. *Id.*

Thus, although the federal government was permitted to carry out executions under the 1937 Act in state facilities in cooperation with state personnel, *see* 50 Stat. at 304—just as it may today, *see* 18 U.S.C. § 3597(a)—it never considered itself *legally obligated* to follow subsidiary details of state execution protocols or pre-execution procedures established by state law. The government's longstanding "practice" in that regard provides further "weight" to the already-compelling evidence that references to the "manner" of execution in federal law have long referred only to the top-line choice of execution method, and not to pre-execution procedures. *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933).

In 1994, Congress "carried forward the relevant language and" substance of the 1937 Act in the FDPA. *In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d at 117 (Katsas, J., concurring); *accord id.* at 148

(Tatel, J., dissenting) ("By using virtually identical language in FDPA section 3596(a), Congress signaled its intent to continue the same system" as the 1937 Act). The FDPA therefore requires what the 1937 Act required: compliance with "the local mode of execution," such as lethal injection, but not all procedural details of state law. *Andres*, 333 U.S. at 745 & n.6. Because BOP conducts federal executions using lethal injection, 28 C.F.R. § 26.3(a)(4)—the same method of execution as Texas, *see Wood*, 836 F.3d at 536—the government has fully complied with the FDPA provision that Vialva invokes, and it need not follow additional state procedures. Accordingly, Vialva cannot demonstrate any likelihood of success on the merits of his claim.

**B. Even If the "Manner" of Implementing a Death Sentence Includes Some Procedural Details Related to Effectuating Death, It Would Not Require the Government to Comply With a State's Pre-Execution Requirements.**

Even if this Court were not inclined to limit the term "manner" in § 3596(a) to a state's top-line choice of execution method, Vialva still could not demonstrate a significant likelihood of success on the merits. As the district court explained, ROA.3670–71, every court of appeals to have considered the question has held that "Section 3596(a) cannot be

reasonably read to incorporate every aspect of the forum state's law regarding execution procedure." *Peterson,* 965 F.3d at 554; *see United States v. Mitchell,* No. 20-99009, 2020 WL 4815961, at *2–3 & n.6 (9th Cir. Aug. 19, 2020); *In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d at 112; *see also Roane,* 140 S. Ct. at 353 (statement of Alito, J.). Instead, those courts have held that the "manner" of implementing a death sentence under § 3596(a) "addresses, *at most,* state laws that set forth procedures for giving practical effect to a sentence of death," such as "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Mitchell,* 2020 WL 4815961, at *2 (emphasis added).

As those courts have determined, pre-execution procedures— including state statutes governing "notice of an execution date"—"fall outside the scope of 18 U.S.C. § 3596(a) because they are not pertinent to effectuating death." *Mitchell,* 2020 WL 4815961, at *3 n.6; *see Peterson*, 965 F.3d at 554 (holding that § 3596(a) addresses "how the sentence is carried out," not procedures that govern other aspects of the execution process such as the number and identity of witnesses); *cf. LeCroy*, slip op. at 11 (declining to decide "precisely" what § 3596(a) covers because,

33

"[w]hatever [it] means, we are confident that it does not extend" to state laws that "ensur[e] a lawyer's presence at execution"). Even Judge Tatel, who would have held in favor of the inmates on some aspects of their FDPA claim in the D.C. Circuit litigation, agreed that § 3596(a) requires the federal government to follow only "those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting).[8] That sound judicial consensus demonstrates that, whatever the scope of § 3596(a), it does not encompass the sorts of pre-execution procedures Vialva cites.

Not only would Vialva's contrary approach be a poor fit with the statutory text and widespread precedent, it would threaten to undermine the basic purpose of the FDPA by making it "impossible to carry out executions of prisoners sentenced in some States." *Roane*, 140 S. Ct. at 353 (statement of Alito, J.). Texas's warrant requirement, for example,

---

[8] As the D.C. Circuit has further determined, to the extent those secondary procedures are covered by § 3596(a), they must be "prescribed by law"; informal state policies or protocols for effectuating death do not qualify. *See In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d at 112; *id.* at 124 n.10 (Katsas, J., concurring); *id.* at 132–33 (Rao, J., concurring).

specifically addresses warrants issued "under the seal" of Texas state courts "to the director of the correctional institutions division of the Texas Department of Criminal Justice at Hunstville, Texas." Tex. Code Crim. Proc. Ann. art. 43.15(a). Texas's statute relating to scheduling of execution dates conditions a court's ability to set the date on the defendant's exhaustion of state habeas corpus remedies. Tex. Code Crim. Proc. art. 43.141(a), (b-1)(2). Strict compliance with those provisions in a federal criminal case, involving the execution of a federal prisoner at a federal facility in Indiana, would be impossible. Requiring federal authorities to comply with such procedural requirements could also, in some states, enable local obstruction of federal sentences.

It is implausible that Congress meant to impose such obstacles, including potentially insurmountable obstacles, on the implementation of federal death sentences. Nor does Vialva identify any federal execution that has been constrained in the way he suggests, including the five federal executions that occurred in July and August 2020 after the Supreme Court denied a petition for certiorari and a stay application from inmates pressing an FDPA claim that is even less sweeping than

35

the one Vialva asserts here. *See Bourgeois v. Barr*, No. 19-1348, 2020 WL 3492763, at *1 (U.S. Jun. 29, 2020).

Accordingly, the fact that BOP's procedures do not precisely track Texas's pre-execution procedures for setting an execution date, issuing an execution warrant, and serving those documents on counsel does not mean that BOP has failed to "implement[]" Vialva's sentence "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). The district court correctly determined that Vialva cannot establish a significant likelihood of proving otherwise. Vialva is not, therefore, entitled to injunctive relief.

## IV.    Equitable Considerations Do Not Favor Injunctive Relief.

Although Vialva does not address the question in his brief, equitable considerations also weigh against issuing an injunction because Vialva cannot demonstrate irreparable injury, that the balance of harms favors him, or that an injunction would comport with the public interest. *See, e.g.*, *In re Fed. BOPs' Execution Protocol Cases*, 955 F.3d at 126 (Katsas, J., concurring) (explaining that motion to enjoin execution should be denied where, "[w]holly apart from the merits," equitable considerations do not favor injunctive relief).

Vialva is not here challenging his death sentence, but only the pre-execution procedures for carrying it out. The mere existence of his death sentence does not, therefore, establish irreparable injury. *See Hill*, 547 U.S. at 580–81; *Wood*, 836 F.3d at 542. And as the district court correctly explained, ROA.3671–72, Vialva has not identified any cognizable harm that would result from following BOP's procedures rather than Texas's. He does not dispute that the top-line manner of execution is the same under federal and state law. *See Lee*, 2020 WL 3964985, at *1 (explaining that federal execution protocol involves lethal injection using a single dose of pentobarbital); *Wood*, 836 F.3d at 536 (same in Texas). And he has already received most of the pre-execution procedures he says he wants. The government selected an execution date well in advance and served a letter on Vialva and his counsel officially notifying him of his impending execution. *See* ROA.3585; *see also Mitchell*, 2020 WL 4815961, at *2 (observing that warden's letter to federal prisoner informing him of execution date functions as an "Execution Warrant" that provides "'official notification'" of the government's intent to carry out his death sentence). The district court then issued a supplemental order ratifying

37

his execution date and directing the Marshals to proceed. (ROA.3674–75.)

Although Vialva notes that Texas law would have required 91 days between the notice and his execution date—rather than the 55 days he received—he has never identified any potentially meritorious legal challenges he might have brought if given more time. (*See* ROA.3671–72.) Vialva has had two decades in which to challenge his sentence and has done so repeatedly (albeit unsuccessfully). He has also litigated extensively in three different jurisdictions since being notified of his execution. (*See* ROA.3672 & n.3 (discussing litigation in this Circuit, the Seventh Circuit, and the District of Columbia).) As the district court correctly explained, "there must come a time when the legal issues 'have been sufficiently litigated and re-litigated so that the law must be allowed to run its course.'" (ROA.3672 (quoting *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) (per curiam)).) That time has now come.

The government also has an overwhelming interest in the timely enforcement of criminal sentences that have been upheld through extensive appellate and post-conviction proceedings in federal courts. *Bucklew*, 139 S. Ct. at 1133. Once post-conviction proceedings "have run

38

their course," as they have here, "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, delay "inflict[s] a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)). Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id.* at 1144 (Breyer, J., dissenting).

The government's interest in implementing Vialva's sentence is magnified by the "heinous" nature of his crimes. (ROA.2660–61.) Vialva was the ringleader of the brutal murders of Todd and Stacie Bagley. After kidnapping them, robbing them, and driving around with them locked in their own trunk for several hours as they pleaded for their lives, Vialva shot them both, killing Todd and then burning Stacie alive. His death sentence has been upheld throughout his many years of direct and postconviction review. The balance of equities therefore tips strongly in the government's favor.

# CONCLUSION

For these reasons, the district court's denial of Vialva's motion to enjoin his execution should be affirmed.

Respectfully submitted,

ROBERT A. PARKER
Criminal Division, Appellate Section
U.S. Department of Justice

JOHN F. BASH
United States Attorney
Western District of Texas

JOSEPH H. GAY, JR.
Appellate Chief
Western District of Texas

**/s/ *Elizabeth Berenguer***
ELIZABETH BERENGUER
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
(210) 384-7100

## CERTIFICATE OF SERVICE

On September 17, 2020, I filed this document with the Fifth Circuit Court of Appeals using the CM/ECF filing system, which will cause a copy of the document to be electronically delivered to the defendant-appellant's counsel:

> Susan N. Otto
> Federal Public Defender
> Western District of Oklahoma
>
> Michael Lieberman
> Assistant Federal Public Defender
> Western District of Oklahoma
>
> Jared Tyler
> Tyler Law Firm, P.L.L.C.

> /s/ *Elizabeth Berenguer*
> ELIZABETH BERENGUER
> Assistant United States Attorney

41

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains **8,019** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook.

/s/ *Elizabeth Berenguer*
ELIZABETH BERENGUER
Assistant United States Attorney

42